Charles O. **BOATWRIGHT**, Employee-Respondent,

v.

**ACF INDUSTRIES**, Incorporated, Employer and Self-Insurer-Appellant.

No. 33814.

St. Louis Court of Appeals, Missouri.

Jan. 26, 1971.

**550**

Gentry, Bryant & Hereford, St. Louis, for employer and self-insurer-appellant.

Mogab, Hughes & Green, St. Louis, David Dempsey, Clayton, for employee-respondent.

DOERNER, Commissioner.

ACF Industries, Incorporated, the employer and self-insurer, appeals from a judgment of the Circuit Court of the City of St. Louis, affirming a final award of the Industrial Commission in favor of the employee, Charles O. Boatwright.

At the first hearing before the Referee, held in January 1968, the parties stipulated that on July 19, 1966, the employee sustained an injury by accident arising out of and in the course of his employment when the employee slipped and fell in a twisted position while crossing wet railroad tracks on the employer's premises. The employee testified that immediately after his fall, he experienced a tingling sensation which started down his right arm and extended to his fingers and into his back; that the same evening he felt the tingling sensation in his left arm, and later in both legs, which subsequently severely ached and pained him, particularly in the mornings, to such an extent as to make him sweat; and that he also developed headaches.

Prior to the hearing the employer's doctor, as well as the employee's doctors, made physical examinations of the employee, none of whom found anything organically wrong with the employee to account for his complaints. Also prior to the hearing the employee had undergone three psychiatric examinations, the first by Dr. Justin M. Adler, of Memphis, Tennessee, to whom he had been sent by the Wayne County (Missouri) Welfare Office; the second by Dr. Joseph S. Shuman, chosen by the employee; and the last by Dr. Walter L. Moore, at the behest of the employer. All three agreed that the employee was suffering from a psychoneurosis. Dr. Adler's psychiatric diagnosis was "Psychoneurosis, Conversion Hysterical Reaction, moderately severe"; Dr. Shuman's was psychoneurosis, conversion reaction, musculoskeletal type; and Dr. Moore's was "Psychoneurosis, mixed type with conversion symptoms, depression and anxiety predominating." According to Drs. Shuman and Moore (Dr. Adler did not appear but his report was admitted by agreement) a psychoneurosis, expressed in layman's language, is a type of mental illness in which the patient exhibits certain symptoms that he honestly believes he feels or exist, but for which no organic reason can be ascertained. Dr. Shuman gave as an example a person who develops the notion and demonstrates the symptoms of paralysis, although no physical basis for the paralysis can be found. Regarding the employee, the testimony of both Dr. Shuman and Dr. Moore was that the employee firmly believed his complaints that his arms tingled and his legs ached to such an extent that he was functionally disabled, although no organic basis for his symptoms were found. It should be added that all three of the psychiatrists, including Dr. Moore, expressed the opinion that the employee was not malingering.

Where the doctors differed, however, was over the question of a causal connection between the employee's accident and his psychoneurosis. In his report Dr. Adler stated, in effect, that the employee's psychoneurosis was the result of his accident. Dr. Shuman testified that the employee's psychoneurosis was definitely and directly caused by his fall.

In his award the Referee found that the employee was not a malingerer; that he

had suffered a period of prolonged disability attributable to his psychoneurosis; but that since it had not been proven that the employee's disability was a clear and direct result of his accident alone, compensation was denied. On review the Industrial Commission reversed the Referee's award, found that the employee's disability was the result of his accident; that the exact nature and extent of such disability could not then be ascertained; and awarded the employee temporary compensation of $52.00 per week from July 20, 1966 to the date such temporary total disability ended, together with the medical, surgical and hospital treatment it found was required. The Commission also set the case for the hearing of further evidence. Pursuant to that order a hearing was held before a Referee on May 29, 1969, at which the employee testified that he had obtained full time employment from Brown Tool Company on February 10, 1969, and that his mental state had greatly improved. Further medical reports from Dr. Shuman and Dr. Moore were also introduced, the former's dated December 26, 1968, and the latter's March 5, 1969. Both doctors confirmed their original diagnosis of psychoneurosis, and Dr. Shuman added that the employee's condition had somewhat improved.

Upon receipt of the transcript of that hearing the Commission ordered a third hearing for the purpose of taking evidence on the issue of permanent partial disability. The necessity for that hearing was obviated, however, when on November 19, 1969, the parties filed a written stipulation with the Commission in which they agreed that the employee had not sustained any permanent partial disability as a result of his accident. Thereafter, on December 5, 1969, the Industrial Commission made and entered its final award in which it found that, "Employee, while in the employ of American Car Company,[1] slipped on a wet railroad track and fell in a twisted position injuring his legs, arms, back, and neck resulting in temporary traumatic neurosis. As a

direct result of said accident, he was temporarily totally disabled from July 20, 1966, to February 9, 1969, both inclusive for a total period of 133⅔ weeks or a total sum of $6,930.86." The Commission further found that the employer had not paid any compensation, and awarded said sum to the employee, together with interest of 6% on each weekly installment from the date it had fallen due and until it was paid. As stated, on employer's appeal from that award, the Circuit Court affirmed.

◼ In Thompson v. Railway Express Agency, Mo.App., 236 S.W.2d 36, 39, this court held that a psychoneurosis is a compensable injury provided its causal connection with the accident is proven by "clear evidence." That decision has been subsequently cited with approval in Cebak v. John Nooter Boiler Works Co., Mo.App., 258 S.W.2d 262; Patane v. Stix, Baer and Fuller, Mo.App., 326 S.W.2d 402; Wilhite v. Hurd, Mo., 411 S.W.2d 72. What the employer now asserts in the first two points in its brief is that the psychoneurosis from which the employee suffered was " * * * caused by factors unrelated to the accident" and that the employee's retention of his neurotc symptoms did " * * * not flow directly and proximately from the accident * * *." Since both points involve the issue of causal connection between the employee's admitted accident and his subsequent psychoneurosis we consider them together.

From the argument portion of its brief it is apparent that by the phrase " * * * factors unrelated to the accident" the employer has reference to the employee's emotional and mental condition which predated the accident. On direct examination Dr. Shuman testified that there definitely was a causal connection between the employee's accident and his subsequent neurotic symptoms, and that the employee " * * * developed the symptoms purely as a result of this fall." However, both in his original report and in his direct examination Dr.

---

1. The then corporate name of the employer.

Shuman stated that he believed the employee was "vulnerable" to the development of neurotic symptoms. He explained that by the use of the word "vulnerable" he did not mean that a person who is vulnerable is mentally ill before the trauma occurs, and expressed the opinion that probably all persons have something in their makeup which, if an event occurs, might cause them to become psychoneurotic. In the case of the employee he stated that the employee's fall was the event which "triggered" his psychoneurosis.

Questioned further on cross-examination regarding the employee's vulnerability Dr. Shuman explained that the employee " * * * was a country boy at heart and would prefer to be on the farm with his father, but it could not support him so he had to go to the city and find work"; that "as a result he was made unhappy and resented society"; that the employee " * * * continued to work as he has to support his family and earn a living"; that he (Dr. Shuman) had " * * * no record of any tension" on the part of the employee; and that the employee " * * * got homesick for the farm." Asked whether he could say that the accident was the sole cause of the employee's psychoneurosis he replied: "The accident was the precipitating cause of it, if it hadn't happened we wouldn't be here today"; that if the accident had not occurred " * * * he would have spent the last forty years coming back from the farm and city and nothing more."

On redirect examination Dr. Shuman testified that " * * * I think most people have an underlying emotional problem," that some are more vulnerable than others to a conversion reaction, and that those are the ones who develop such a condition when some event or experience causes it to occur. As to the cause of the employee's neurosis he again stated flatly that "The cause is the fall he took." And on recross examination he testified that the employee's " * * * underlying condition could have gone that way for another fifty years without any further trouble if he hadn't had

that fall so the fall is what triggered off the whole business."

However homesick the employee may have been for the farm or unhappy about having to work in the city the undisputed evidence was that the employee enjoyed good health and worked regularly prior to the accident. At 16 years of age he began to work in a bakery, where he was employed for 1½ years, and thereafter he alternated between working on the farm and for McDonnell Aircraft Company (for three periods), Lincoln Engineering Company, and two separate periods for the employer. The service records of McDonnell introduced by the employee showed that there were relatively few absences for either sickness or personal reasons during the three periods in which he was employed by that company. The employer did not introduce any service record of its own regarding the employee.

In its final award the Industrial Commission found that the accident which the employee admittedly sustained directly caused his "temporary traumatic neurosis," which temporarily totally disabled him. We hold that the foregoing testimony of Dr. Shuman, as well as the opinion expressed by Dr. Adler in his report, was clear and ample competent evidence to support the Commission's finding as to the direct causal connection between the accident and the employee's subsequent neurotic symptoms. And since the only medical witness who might be said to have differed with Dr. Shuman and Dr. Adler on the issue of causal connection was Dr. Moore, there obviously is no merit in the employer's argument regarding the overwhelming weight of the evidence. For even if it is assumed that Dr. Moore's testimony was directly contrary to that of Dr. Shuman's, the evidence of Dr. Moore cannot reasonably be said to be "overwhelming."

Carefully analyzed, the fact of the matter is that the testimony of Dr. Moore did not contradict or greatly differ from that

of Dr. Shuman. His diagnosis of the employee's condition, as was Dr. Shuman's, was psychoneurosis, although he classified it further as a "mixed type with conversion symptoms" rather than "conversion reaction" as stated by Dr. Shuman. He agreed with Dr. Shuman that the employee's neurotic symptoms disabled the employee from working, and that the employee's disability existed from the time of his accident. He further agreed with Dr. Shuman that the employee was not a malingerer. And .he also agreed with Dr. Shuman as to the farm-city, dependency, and economic factors in the make-up of the employee which predated the accident. Where he supposedly differed from Dr. Shuman was in the emphasis that he placed on the employee's personality prior to the accident, which he variously described as not "normal," as a "neurotic personality," and as a "pre-neurotic personality." On direct examination, towards the end of his hypothetical question, the employer's counsel asked the doctor: " * * * Can you tell us with any degree of medical certainty if you have an opinion as to the primary cause of having these symptoms at the time you examined him?" To that the doctor responded: "I don't like the word choice of 'primary' I think the etiological factor in the present neurosis is a multiple factor." But on direct examination he did testify that while in his opinion the accident did not play too much of a part or role in the employee's psychoneurosis " * * * other than giving him a focus of reverting back to a tendency, but it plays a part."

The reason Dr. Moore demurred at counsel's use of the words "primary cause" became apparent on cross-examination. Asked about his use of the words "factor" and "cause" he replied: "I use causing factors and precipitating factors which are different. * * * " On the doctor's use of the word "cause" the transcript further shows the following:

"Q From a psychiatrist point of view, when you see a person exhibiting certain behavior, almost by nature of your profession you are looking behind the scenes almost methodically?

"A Yes, sir.

"Q These etiological factors you are referring to are unconscious factors that happened before this happened?

"A He may not be conscious of playing a part.

"Q Now, doctor, assuming you are taking your opinion on this matter, and correct me if I'm wrong, I take it you feel it would not be proper to state that this accident caused this man's present condition. because of these pre-existing unconscious etiological factors?

"A I don't know how unconscious this was, but there were symptoms which to him explains his inability to function.

"Q But you understand when I use the word 'cause' I use it in the legal sense of which I think you are familiar?

"A That's right.

"Q In the legal sense of 'cause' would you say that this caused this man's present condition?

"A No, I don't think so.

"Q And the reason that you say no is because of the pre-existing etiological causes below the surface.

"A That is correct."

Having conceded that the employee was functioning before the accident and that he did not function after the accident the doctor was asked:

"MR. DEMPSEY: The fact of the matter is, doctor, from a functional point of view Mr. Boatwright was functioning before the accident and he did not function after the accident, and the accident was a productive factor of it?

"THE WITNESS: .It precipitated the function which continued his symptomatic complaints but it serves the need to the patient.

"MR. DEMPSEY: Had it not been for the fall he sustained on July 19, those other symptoms would not have been precipitated on that date?

"THE WITNESS: That is correct."

The import of the doctor's testimony, as we view it, is that the employee's pre-existing personality was such that he was predisposed towards the development of his subsequent psychoneurosis and that the accident was therefore not the sole cause of the symptoms that he developed. But from the last passage quoted it is apparent that it was Dr. Moore's opinion that the accident did precipitate the development of the employee's psychoneurotic symptoms which functionally disabled him. That testimony in itself was sufficient to show the causal connection between the employee's accident and the functionally disabling psychoneurosis from which he suffered as a result of the accident.

From the inception of the employee's claim in 1966 up to the present the employer has vigorously denied both that the employee's psychoneurosis resulted from the accident and that the employee was entitled to any compensation. And despite the fact that the Industrial Commission in its temporary award of August 2, 1968, found that the employee was temporarily totally disabled as a result of his accident, directed the employer to pay temporary compensation retroactive to July 20, 1966, and to " * * * provide employee with such medical, surgical and hospital treatment as may reasonably be required or necessary to cure and relieve him from the effects of his injury, * * *" up to the present time the employer has not paid a cent of compensation to the employee; nor does the record show that since the date of that temporary award it tendered to the employee any medical or hospital treatment as it was ordered to do. Yet despite this record of the employer's unyielding opposition to the employee's claim and its refusal to comply with the Commission's temporary award, the employer seemingly finds no anomaly

in contending in the final point of its brief, that " * * * The claimant's continued and adamant refusal to submit to medical treatment requires the denial of compensation." Its only citation in support of its argument is Section 287.140(4) which provides, in brief, that no compensation shall be payable for the disability of an employee, if and insofar as the disability was caused or continued by any unreasonable refusal to submit to any medical or surgical treatment when the risk is inconsiderable.

 We find no merit in the employer's contention. An alleged unreasonable refusal of the employee to submit to medical treatment is an affirmative defense, and the burden of proving such a defense is on the employer. Haill v. Champion Shoe Machinery Co., 230 Mo.App. 631, 71 S.W.2d 146; Cuchi v. George C. Prendergast & Sons, Mo.App., 72 S.W.2d 136. And whether such treatment was refused, and if so whether the refusal was unreasonable, are issues of fact which must be determined by the triers of fact, the Commission. Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647; Cuchi v. George C. Prendergast & Sons, supra. So far as the record before us shows the employer never asserted its affirmative defense either in its answer, or in any other manner, prior to the final award of the Industrial Commission. Moreover, logic and the law dictate that there can be no unreasonable refusal to submit to medical treatment until such treatment is tendered by the employer to the employee and is refused. Wood v. Wagner Electric Corp., supra. The closest that the employer's evidence approaches that subject was Dr. Moore's recommendation to the employee that he enter a hospital for treatment, to which the employee demurred because he was afraid of hospitals. Dr. Moore was an examining physician for the employer, not a doctor to whom the employer had sent the employee for treatment. There is nothing in the evidence to indicate that in making his recommendation Dr. Moore was authorized by the employer to offer medical treatment to the

employee, or, in fact, that his recommendation constituted an offer to treat the employee. At best, it was nothing more than advice, and not a tender. Haill v. Champion Shoe Machinery Co., supra. In fact, even though Dr. Moore stated in his report of January 8, 1968, that "In my opinion this patient requires hospitalization for further medical and psychiatric studies and treatment," (which contains no reference to any refusal by the employee) there is no evidence that the employer ever made such a tender to the employee.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court.

Accordingly, judgment affirmed.

BRADY, P. J., and DOWD and WOLFE, JJ., concur.