Stanley G. BERRY, Appellant,

v.

MOORMAN MANUFACTURING COM-
PANY, Employer, and Liberty Mutual
Insurance Company, Insurer, Respon-
dents.

No. WD 35116.

Missouri Court of Appeals,
Western District.

July 31, 1984.

Zachary T. Cartwright, California, for ap-
pellant.

Anna M. Beck, St. Louis, for respon-
dents.

Before LOWENSTEIN, P.J., and MANFORD and BERREY, JJ.

LOWENSTEIN, Judge.

Stanley Berry appeals from an order of the circuit court of Moniteau County affirming the final award of worker's compensation as reviewed by the Labor and Industrial Relations Commission and rendered by the administrative law judge.[1] In June 1976, Berry sustained an injury to his right eye while working as an outside salesman for respondent Moorman Manufacturing Company (insured by Liberty Mutual), and later developed a cataract resulting in a 99.99% loss of eyesight. Berry filed a report of injury with the Division of Workman's Compensation a claim for compensation in August 1977 and an amended claim in April 1981. The amended claim described the nature of his permanent injury as "loss of sight in the right eye," the prior claim, as "injury to the sight of the right eye." The respondents' answer did not raise any affirmative defenses. At the hearing before the administrative law judge, both parties agreed the only issues to be resolved were 1) the amount of medical care and responsibility for medical care required to cure and relieve the effects of Berry's injury; 2) casual connection between injury and disability; and 3) the nature and extent of permanent partial disability.

At the hearing, Berry testified that on June 16, 1976, he was having difficulty with a leaky car radiator during a sales trip for his employer. He had used several brands of radiator fluid in an attempt to stop the leak. During one of his customer stops, a meat market north of California, Missouri, Berry raised the hood of his car and bent underneath to examine the problem when radiator fluid splashed out. The fluid and/or radiator cap hit his face and right eye. After slamming down the hood and turning off the car engine, Berry walked inside to the washroom, looked in the mirror, and saw his eye "completely full of blood." He splashed cold water in his eye, put a patch over it, and within 30 minutes drove to a Dr. Gallagher's office in California, Missouri. There the doctor examined the eye, washed it out with a solution and salve, and put a patch over it for 3–4 days. After three months the blood in the right eye had not completely disappeared.

Berry also noticed problems with depth perception and seeing light shortly after the accident. After approximately 5 months, Berry returned to see Dr. Gallagher who recommended seeing an eye specialist. Berry waited before returning to the doctor because he'd been told the healing process would take 12–13 weeks. From December, 1976 until the hearing Berry began seeing Dr. Cheek, an eye specialist, on a continuous basis for a total of 10–12 visits. He was diagnosed as having open angle glaucoma. Initially Dr. Cheek noted a small opacity, or cataract, in his examination of the left eye and a more advanced cataract in the right eye. Berry noticed changes in the vision of his right eye over the period after the accident. He referred to problems of "scumminess," distinguishing objects especially in bright light, seeing halos, and depth perception all hindering his vision. Similar changes did not occur in the left eye. The right eye's vision continued to worsen until very little sight remained.

Berry had had his eyes checked 2–3 weeks before the accident by an optometrist, had his drivers license renewed in March of 1976, and a glaucoma test by a mobile unit 3–4 months before the accident, all without any indication of problems with his eyes.

When asked whether he was aware of the possibility of correcting problems with his right eye through surgery, Berry replied that he was aware of this possibility. When asked why no surgery had been performed on him up to the time of the hearing, Berry testified, "I don't like the odds." When asked to explain, he replied, "the

---

1. Appeal to the circuit court was proper because the claim arose before August 13, 1980. Section 287.490 RSMo.1978 and as amended by Laws 1980, p. 374, § 1.

condition of my eye is that I'm on the borderline of a transplant. * * * I can't see through the eye and tell what's wrong and nobody can look into it and tell what's wrong, and with an operation the odds are less than fifty-fifty. * * * It's going to be up to me to someday make a decision. If my other eye goes bad, I'm going to have to have one of the two operated on—and with newer techniques coming along, that's the reason I didn't like the odds now. I'm hoping the odds will get better." On cross-examination, Berry agreed that at the present time he did not want to have corrective surgery for the cataract in his right eye.

Berry could not recall submitting any medical bills to his employer. Other than Dr. Lewin, however, the employer-insurer never designated a physician they wanted him to see about his eye difficulties nor did they provide him with any medical attention.

Upon stipulation the depositions of Dr. Charles Cheek, the claimant's doctor, and Dr. Howard Lewin, the respondents' doctor, were admitted into evidence. In Dr. Cheek's opinion the accident in June 1976 caused or contributed to cause the traumatic cataract in Berry's right eye, but did not relate in any way to the glaucoma or minimal cataract he suffered in the left eye. This case concerns only whether the cataract in the right eye is compensable. He testified that Berry suffered a 99.99% permanent loss of visual efficiency in his right eye as a result of the cataract. The cataract in the right eye had progressively worsened while basically the small opacity noted in the left eye had remained the same. In practical terms the disability meant Berry's right eye could not see fingers raised three inches in front of him. Dr. Cheek described his condition as permanent. The restoration of vision could be achieved through surgery in one of three ways after removal of the lens of the eye—through a "cataract glass," through the use of a contact lens, or through an artificial lens implant sewn inside the eye at the time of surgery. The first option was ruled out for Berry because a cataract

glass cannot be worn on just one eye. Dr. Cheek stated that "assuming no complications, Mr. Berry has a 98% chance of obtaining 20/20 vision."

Dr. Lewin's deposition testimony, offered into evidence by the respondents, concerned *only* the disputed issue of *causation.* In Dr. Lewin's opinion, the accident did not cause or contribute to cause the cataract in Berry's right eye. Dr. Lewin testified he would rate the percentage of disability only after removal of the cataracts. At the time of his deposition, Dr. Lewin stated Berry had 100% loss of vision efficiency in the right eye; after removal of the cataracts and if visual acuity returned with glasses, he would rate the loss as 75–80% to the eye. This rating would depend upon what Berry's visual acuity would be after successful removal of the cataract and the prescribing of glasses.

The award of the administrative law judge found the cataract was caused by the injury and therefore compensable and awarded sums for future and past medical care. The portion of the award contested by Berry denies him any amount for permanent partial disability for the loss of visual efficiency based upon § 287.140(4) which provides as follows:

> No compensation shall be payable for the ... disability of an employee, if and in so far as the same may be caused, continued or aggravated by any unreasonable refusal to submit to any medical or surgical treatment or operation, the risk of which is, in the opinion of the commission, inconsiderable in view of the seriousness of the injury.

Appellant attacks the denial of permanent partial disability along three bases. First, he argues the denial is the result of a misapplication of law based upon a "non-pleaded and non-viable affirmative defense." His second attack contends the Commission acted in excess of its jurisdiction in denying the disability award after finding the claimant's injury had arisen out of and in the course of his employment. Third, he argues that the finding of unrea-

sonable refusal to submit to surgery is not supported by competent and substantial evidence.

■■■ An employee's alleged unreasonable refusal to submit to surgery is an affirmative defense, with the burden of proof resting upon the employer. *Boatwright v. ACF Industries*, 463 S.W.2d 549, 554 (Mo.App.1971); *Cuchi v. George C. Pendergast & Sons*, 72 S.W.2d 136, 137 (Mo.App.1934); *Haill v. Champion Shoe Machinery Co.*, 230 Mo.App. 631, 71 S.W.2d 146, 149 (1934). Whether or not an employee's refusal of surgery is unreasonable is an issue of fact. *Boatwright v. ACF Industries, supra; Wood v. Wagner Electric Corp.*, 355 Mo. 670, 197 S.W.2d 647, 651 (banc 1946); Annot., 105 A.L.R. 1470, 1481 (1936). There can be no unreasonable refusal to submit to medical treatment until this treatment is tendered by the employer and refused by the employee *Boatwright v. ACF Industries, supra* at 554.

■■■ The respondents did not specifically raise the affirmative defense in answering the appellant's claim for compensation or in any other manner. *See* 8 CSR 50–2.010(12); Missouri Workers' Compensation Law, The Missouri Bar (1969, 1981) § 8.7. Nor was this issue framed by the administrative law judge or by the parties at the beginning of the hearing as one of the disputed issues to be resolved. "At the beginning of each hearing the referee shall ascertain from the parties the facts on which there is agreement and shall thereafter confine the evidence to contested issues." 8 CSR 50–2.010(22). Administrative agencies, just as the general public, are bound by the terms of rules promulgated by them. *See Mississippi Valley Barge Line Co. v. United States*, 252 F.Supp. 162, 166 (E.D.Mo.1966), appeal dismissed, 385 U.S. 32, 87 S.Ct. 195, 17 L.Ed.2d 31. The *sua sponte* forfeiture of the claimant's right to permanent disability under § 287.-140(4) allowed the respondents to take the inconsistent positions of denying any responsibility for the accident at the hearing, while on appeal arguing the unpleaded and uncontested issue of unreasonable refusal of surgery. This surgery was never tendered by the employer to the claimant. Before the affirmative defense of unreasonable refusal of surgery may be relied upon by an employer, the proposed surgery must have been offered to the claimant. *Wood v. Wagner Electric Co., supra; Boatwright v. ACF Industries, supra.* The logic of this requirement is to avoid abstract determinations of whether or not the refusal of surgery was unreasonable. There was nothing to prevent the employer and insurer from amending their answer to plead this alternative course of surgical action, make a record at the hearing on the tender of remedial cataract surgery for this claimant and the risk to him. The respondents attempt on appeal to shift the blame for their failure to tender any operation on the claimant's lack of cooperation in submitting eye care bills to Liberty Mutual as requested. Any lack of cooperation regarding medical bills would not diminish the employer's responsibility to tender an operation, the refusal of which would accrue to the employer's benefit and provide the context for the fact determination of whether or not the refusal was unreasonable. Nowhere do the respondents claim that Berry refused to cooperate with any effort on their part to discover the scope of his injuries or refused examination by one of their physicians. More reasonably the failure to tender an operation is explained by the respondents' inconsistent position taken at the hearing that the claimant's injuries did not result from the accident, than by any failure to submit medical bills. The respondents can claim no surprise by the diagnosis of cataract in the right eye nor from Dr. Cheek's deposition testimony, taken some eight months before the hearing.

■■■ The award of the commission may be set aside only if there is no competent and substantial evidence to support it, or if the findings are clearly contrary to the overwhelming weight of the evidence. *Matthews v. Roadway Express, Inc.*, 660 S.W.2d 768, 769 (Mo.App.1983). The find-

ing of "unreasonable refusal" under the statute is not supported by substantial and competent evidence on the record as a whole. The judge decided the issue only on the basis of abstract facts since no operation had ever been tendered by the employer. Dr. Cheek spoke of the odds of successful eye surgery but did not relate those odds to Berry's particular health conditions. Dr. Cheek qualified his prediction of successful surgery by assuming no complications would arise, without identifying or relating to Mr. Berry's particular health conditions the factors that would make any complications likely. Berry's own testimony only indicated his own more pessimistic perception of the odds for successful eye surgery, without revealing any basis for this belief. The burden of proof rested upon the employer to show the refusal of tendered surgery was unreasonable. *Boatwright v. ACF Industries, supra; Cuchi v. George C. Pendergast & Sons, supra; Haill v. Champion Shoe Machinery Co., supra.* To now allow a remand for an evidentiary hearing on this issue never before raised by the employer-insurer would be unfair. Even somehow excusing the respondent's failure to tender the operation, they also failed to satisfy their burden of proving with substantial evidence that the refusal of surgery was unreasonable. There was simply no competent or substantial evidence to support this finding of the commission.

Respondents point to regulations for the ratings for traumatic cataracts stating: "Compensable disability shall not be computed until all adequate and *reasonable* operations and treatment known to medical science *have been offered* to correct the defect." 8 CSR 50–5.020.9(f) (emphasis added). The regulations also provide for particular ratings *"when* a traumatic cataract has been successfully treated by surgical or medical methods."‚ 8 CSR 50–5.020.9(g) Table No. 3 (emphasis added). These regulations do not further the respondents' argument that no permanent partial disability can be awarded because no surgery has been performed, when no surgery *has been offered* to the

claimant. Under the particular circumstance where the employer fails to make an issue of the unreasonable refusal of surgery and no surgery has ever been offered, the claimant here is entitled to a rating for the actual loss of vision suffered by him. *Cf. Graf v. National Steel Products,* 225 Mo.App. 702, 38 S.W.2d 518 (1931). Under these particular circumstances, however, an award for a "disability that is permanent in nature and partial in degree," § 287.190, subd. 6, is inconsistent with the final award for future medical surgery and care.

The portion of the final award denying any permanent partial disability is reversed and the cause remanded for the Commission to enter an award of permanent partial disability for appellant's right eye based upon a further consideration of the evidence. The portion of the final award which gives appellant $3,900 for future medical surgery and hospital care is hereby reversed outright. That portion of the award that gives $188 for medical aid not furnished by the employer is affirmed.

All concur.